# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ROBERT MELOCK, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | Case No. |
| v. | ) | |
| | ) | |
| CITY OF WAUKEGAN, LUCIAN | ) | |
| TESSMANN, DONALD MEADIE, DAVID | ) | **JURY TRIAL DEMANDED** |
| YARC, MICHAEL TAYLOR, ROBERT | ) | |
| WINSTON, KEVIN RUNYARD, RICHARD | ) | |
| DAVIS, PHILIP STEVENSON, PATRICK | ) | |
| HALEY, JOHN REID & ASSOCIATES, INC., | ) | |
| MICHAEL MASOKAS, and MARK REID, | ) | |
| *Defendants.* | | |

## COMPLAINT

NOW COMES Plaintiff, ROBERT MELOCK, by his attorneys LOEVY & LOEVY, and complaining of Defendants the CITY OF WAUKEGAN, LUCIAN TESSMANN, DONALD MEADIE, DAVID YARC, MICHAEL TAYLOR, ROBERT WINSTON, KEVIN RUNYARD, RICHARD DAVIS, PHILIP STEVENSON, PATRICK HALEY, JOHN REID & ASSOCIATES, INC., MICHAEL MASOKAS, and MARK REID states as follows:

### INTRODUCTION

1. Plaintiff Robert Melock was just 22 years old when he was wrongfully convicted of the brutal murder of his 72-year-old grandmother. The crime occurred in Waukegan, Illinois, in 1989.

2. Plaintiff had nothing to do with the crime. Not one piece of physical evidence connected Plaintiff to the murder. He had no motive to commit the crime.

1

3.      Instead, Plaintiff was arrested, tried, and convicted solely because Defendants conspired among themselves to coerce Plaintiff to sign two fabricated false confessions over the course of a 17-hour intensive and abusive interrogation, manipulate evidence of Plaintiff falsely confessing to a jailhouse snitch, and withhold exculpatory evidence.

4.      Defendants' misconduct caused Plaintiff to initially be sentenced to death before a retrial resulting in a sentence of a minimum of 85 years in prison.

5.      This began a 35-year-long ordeal to clear his name, during which time Plaintiff missed out on precious time with family and friends and spent time in Illinois prison where he endured violence and the constant struggle of knowing he might spend the rest of his life carrying the labels of "murderer" and "rapist" for a crime he did not commit.

6.      After Plaintiff spent over three decades in prison, a logbook Defendants had suppressed proved that Plaintiff and the jailhouse snitch were never confined together, so he could not have confessed to her.

7.      Plaintiff's attorneys moved for post-conviction relief based on the logbook, along with evidence that Police Officer Defendants had engaged in a pattern of fabricating confessions to convict innocent people of crimes.

8.      The Conviction Integrity Unit of the Lake County State's Attorney's Office stipulated that Plaintiff's "constitutional rights were violated when exculpatory evidence was suppressed, by the police destruction of evidence, and by [Plaintiff] being denied the opportunity to present evidence of the circumstances surrounding the interrogation." The parties agreed that Plaintiff's conviction should be vacated.

9.      On December 12, 2023, the court vacated Plaintiff's conviction.

10. The same day, the State entered a motion of *nolle prosequi* and dismissed all charges against him.

11. Plaintiff now brings this lawsuit seeking redress for the devastating injuries he endured and continues to suffer because of Defendants' misconduct.

## JURISDICTION AND VENUE

12. This action is brought pursuant to 42 U.S.C. § 1983 and Illinois law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

13. This Court has subject-matter jurisdiction over Plaintiff's 42 U.S.C. § 1983 claims under 28 U.S.C § 1331.

14. The court has subject-matter jurisdiction over Plaintiff's state-law claims under 28 U.S.C. § 1367.

15. Venue is appropriate in this district and division because Plaintiff's criminal case was investigated and tried in Lake County, Illinois, such that a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within this judicial district. 28 U.S.C. § 1391(b).

## PARTIES

16. Plaintiff Robert Melock is a 58-year-old man living in Davisburg, Michigan. He spent 35 years incarcerated for a crime he did not commit.

17. At all times relevant to the events described in this complaint, Defendants Lucian Tessmann, Donald Meadie, David Yarc, Michael Taylor, Robert Winston, Kevin Runyard, and Richard Davis were officers of the Waukegan Police Department ("WPD").

18.     At all times relevant to the events described in this complaint, Defendants Philip Stevenson and Patrick Haley supervised officers of the WPD. These Defendants participated in the misconduct alleged in this complaint and also facilitated, condoned, approved, and turned a blind eye to the misconduct of the Police Officer Defendants whom they supervised.

19.     Defendant City of Waukegan is a municipality and was or is the employer of each individual Police Officer Defendant. The City of Waukegan is liable for the individual Defendants' misconduct while acting within the scope of their employment for the City. The City of Waukegan is liable for all torts committed by the individual Defendants while employed by the City of Waukegan pursuant to the doctrine of *respondeat superior*. Defendant City of Waukegan is additionally responsible for the policies and practices of the WPD.

20.     Defendant John Reid & Associates, Inc. ("John Reid"), is a for-profit Illinois corporation with its principal place of business at 123 W. Madison Street, Chicago, Illinois 60602. At all times relevant to the events described in this Complaint, Defendant John Reid reached agreements to provide the WPD and its officers with training, advice, and consultation in connection with the interrogation of individuals suspected of criminal activity. Defendant John Reid, in fact, routinely provided that training, advice, and consultation pursuant to those agreements. In addition, Defendant John Reid and its employees and agents conducted, participated in, collaborated with, and encouraged the interrogation of individuals suspected of criminal activity by the WPD and its officers. Many interrogations, including that at issue in this Complaint, occurred in whole or in part at the Chicago office of Defendant John Reid, and employees of Defendant John Reid, including Defendants Michael Masokas and Mark Reid, participated in investigations alongside officers of the WPD. The WPD and its officers regularly delegated to Defendant John Reid and its employees the responsibilities of interrogating,

4

polygraph testing, and eliciting testimony from persons suspected of crimes. Defendant John Reid is liable for all torts committed by its employees pursuant to the doctrine of *respondeat superior*.

21.     At all times relevant to the events described in this Complaint, Defendant Michael Masokas and Mark Reid were employees of Defendant John Reid who directed, conducted, and participated in the police interrogation of Plaintiff and the investigation conducted by the WPD.

22.     Defendants Tessmann, Meadie, Yarc, Taylor, Winston, Runyard, Davis, Stevenson, and Haley are referred to collectively as the "Police Officer Defendants" throughout this Complaint.

## ALLEGATIONS

### The Murder of Augustine Melock

23.     On January 15, 1989, somebody broke into the home of 72-year-old Augustine Melock in Waukegan, Illinois and assaulted and killed her.

24.     The WPD investigated the crime.

25.     To this day, the crime remains unsolved. By focusing exclusively on the wrong man, the WPD has let the real killer remain at large for over three decades.

### Defendants Target Robert Melock
### Despite No Evidence Against Him

26.     In the winter of 1989, Plaintiff Robert Melock was 22 years old. He lived with his maternal grandmother, Maria Yantz.

27.     His paternal grandmother, Augustine Melock, also lived in Waukegan.

28.     Plaintiff had nothing to do with Augustine's murder. He is completely innocent of the crime.

29.     At the time of Augustine's murder, Plaintiff was familiar with some of the Police Officer Defendants, including Lucian Tessmann.

30. Based on nothing other than a hunch, Police Officer Defendants set their sights on Plaintiff.

31. On the same day as the murder, Defendants David Yarc and Michael Taylor went to Plaintiff's house and took him to the Waukegan Police Station for questioning.

32. Once at the station, Defendants, including Yarc and Taylor, took Plaintiff to an interview room, and began interrogating him about whether he was involved in his grandmother's murder.

33. Plaintiff repeatedly maintained his innocence to the Defendants and, after several hours, Defendants let Plaintiff go.

34. A couple days later, on the morning of January 19, Police Officer Defendants, including Lieutenant Philip Stevenson, who was overseeing the investigation, Captain Patrick Haley, and Detectives Tessmann, Donald Meadie, and Richard Davis, met about the case.

35. Despite lacking any evidence implicating him, the Defendants decided to bring Plaintiff in once again to build a case against him for his grandmother's murder regardless of the evidence.

### Defendants Detain Plaintiff and
### Coerce His Fabricated Confession

36. This time, Police Officer and John Reid Defendants, including Tessman, Meadie, Michael Masokas, and Mark Reid, interrogated Plaintiff using psychological and physical coercion.

37. The interrogation began in the morning on January 19—after Defendants Tessmann and Meadie woke Plaintiff up at his house and brought him to the police station—and continued over the course of a 17-hour period—until the early morning hours on January 20.

38. The Defendants knew at all points during their interrogation that Plaintiff was

young and suffered from intellectual deficits that would render him especially vulnerable to their coercive techniques.

39.     In an effort to exhaust and disorient Plaintiff, the interrogation took place in multiple locations, including various interrogation rooms at the Waukegan Police Station and those of John Reid & Associates in downtown Chicago.

40.     In the first several hours of the interrogation, at the Waukegan Police Station, Defendants Tessmann and Meadie took Plaintiff to a small interview room where they questioned him and accused him of murdering his grandmother.

41.     Plaintiff steadfastly maintained his innocence. It was obvious to Defendants that Plaintiff was innocent, as he did not know anything about the crime. Yet Defendants persisted, refusing to accept the truth of Plaintiff's innocence.

42.     Having failed to obtain anything incriminating, Defendants Tessmann and Meadie left Plaintiff alone in the interrogation room and went to speak with other Police Officer Defendants, including Stevenson and Davis, to discuss how to proceed with their plan to extract a false confession from Plaintiff.

43.     As a result of that meeting, Defendant Davis arranged for a polygraph examination and interrogation to take place that afternoon at the offices of John Reid & Associates in Chicago.

44.     The WPD and John Reid were frequent collaborators, with the WPD often using John Reid to interrogate and polygraph potential criminal suspects. In addition, John Reid runs a school for instructing police officers on methods of interrogation. Many Waukegan Police Officers attended the school, including Tessmann.

45.     Police Officer Defendants, including Tessmann and Meadie, transported Plaintiff to downtown Chicago to interrogate him further at the office of John Reid. At John Reid, Plaintiff

was interrogated for many more hours, subjected to a polygraph test, questioned, and was repeatedly accused of murdering his grandmother. He was also accused, for the first time, of sexually assaulting his grandmother prior to the murder.

46. The John Reid employees, including Masokas and Reid, were acting as agents of the WPD at the time of the polygraph interrogation, and at the time they witnessed and participated in the further interrogation of Plaintiff with the Waukegan police.

47. The Defendants used a polygraph examination for the sole purpose of coercing a statement from Plaintiff. The method of interrogation used during this polygraph was designed to break Plaintiff's will through the use of repetitive, suggestive, and accusatory questions, in a bizarre, unfriendly setting.

48. Masokas, who at times took the lead in interrogating Plaintiff to coerce his confession, and the other Defendants also decided to lie to Plaintiff and tell him that, based on the results of the polygraph exam, they were 150 percent sure that he had killed and raped his grandmother. The test results indicated no such thing.

49. Tessmann repeatedly and strenuously accused Plaintiff of the crime, while simultaneously telling Plaintiff that he "would go to bat for him" and would "put in a good word" for him in court if he would just confess to killing his grandmother.

50. Those strong accusations of guilt were joined with physical threats. Tessmann— standing over six feet tall and weighing over 200 pounds—got in Plaintiff's face and acted in a manner that led Plaintiff to reasonably believe that he would suffer physical violence if he did not cooperate.

51. In the face of the extreme psychological abuse and coercion described above, however, Plaintiff continued to maintain his innocence. Plaintiff told the Defendants over and over

8

that he had no connection to Augustine's murder or the supposed rape. The Defendants ignored evidence that corroborated his claims of innocence, including the fact that he knew nothing about the crime.

52.     After hours of interrogation at the Waukegan Police Station and hours of interrogation and a polygraph examination at John Reid & Associates, the Defendants knew that their misconduct was breaking Plaintiff down.

53.     To overcome Plaintiff's will, Defendants, including Masokas, Tessmann, and Meadie, tried a new tactic: Manufacturing a written confession to the crime and then coercing Plaintiff into adopting it.

54.     Defendant Tessmann wrote a statement on John Reid letterhead implicating Plaintiff in Augustine's murder and coerced Plaintiff to sign it.

55.     That statement, signed in the evening on January 19 at John Reid, was the first of two fabricated false confessions that the Defendants coerced Plaintiff into signing.

56.     Once Plaintiff signed the fabricated confession at John Reid, Defendants Tessmann and Meadie placed him in handcuffs, read him his *Miranda* rights, and drove him back to Waukegan.

## Defendants Coerce a Second
## Fabricated Confession from Plaintiff

57.     Subsequently, the Police Officer Defendants, including Tessmann and Meadie, realized that the statement was missing critical details, threatening their plan to solve the case through Plaintiff's false confession.

58.     They decided to fabricate an additional statement from Plaintiff to secure his conviction. This statement was type-written by Defendants and included information totally absent

from the first statement, including, for example, that Plaintiff sexually assaulted his grandmother before murdering her.

59.     Defendants presented Plaintiff with a new type-written statement. As with the first statement, they did not read it to Plaintiff or ask him to read it for himself. Instead, they had Plaintiff initial typographical mistakes they had intentionally inserted. Then, they coerced Plaintiff into signing it. They did so by leading Plaintiff to believe he was simply signing a statement detailing the version of events he had been giving all along: That he did not kill his grandmother.

60.     All told, Plaintiff—a vulnerable and frightened 22-year-old—spent nearly an entire day subjected to Defendants' pressures before he signed the second statement around 2:00 AM on January 20.

61.     The fabricated statements from the evening of January 19 and the early morning hours of January 20 were signed by Plaintiff involuntarily due to his being subjected to numerous and prolonged interrogations over a 17-hour period, and due to the coercive tactics used by Police Officer and John Reid Defendants.

### Defendants Fabricate Testimony from a Jailhouse Snitch and Cover Their Tracks

62.     With only the shaky fabricated confessions and no physical evidence connecting Plaintiff to the brutal crime, Police Officer Defendants, including Robert Winston and Kevin Runyard, decided to strengthen the case against Plaintiff. They concocted a plan to recruit a jailhouse snitch and elicit false testimony from that individual implicating Plaintiff in his grandmother's murder.

63.     While Plaintiff was in lockup at the Waukegan County Jail the day after his interrogation, Defendant Winston was assigned to observe Plaintiff.

64.     As with other Police Officer Defendants, Plaintiff was familiar with Winston. Winston and Plaintiff's father had problems with each other.

65.     Defendant Winston wrote a report from that day in lockup stating that he overheard a conversation between a woman named Janice Randolph, who was locked in a cell across from Plaintiff's cell, and Plaintiff. According to that report Randolph yelled out, asking Plaintiff what he was in for, and Plaintiff then supposedly yelled back that he killed his grandmother.

66.     The story was false, and Janice Randolph refused to implicate Plaintiff. So, Police Officer Defendants, including Winston and Runyard, conspired amongst each other to substitute a jailhouse snitch who would play along: Susan Holloway.

67.     With their new "witness" teed up, Defendants had to deal with Winston's prior report naming Randolph. They did so by first fabricating a photo line-up in which they falsely stated that Defendant Winston had identified Holloway, not Randolph, as the person Plaintiff confessed to. Then, Defendant Winston fabricated a supplemental report stating that he had been mistaken about the individual in the cell across from Plaintiff—that person was Holloway, not Randolph.

68.     Defendant Runyard knew that the fabricated supplemental report was false but reviewed and approved it to further the conspiracy.

69.     Holloway gave a false statement and testified at Plaintiff's first trial that he had confessed to her that he was in jail for murdering his grandmother, when, in fact, no such conversation ever took place. At Plaintiff's second trial, Holloway could not be found, so her testimony about Plaintiff's confession to her was read in.

70.     The Police Officer Defendants recruited Holloway and caused her to provide false evidence implicating Plaintiff in the crime, all while knowing that these statements were false.

71.     In fact, a logbook from the jail lockup shows while Janice Randolph was in lockup with Plaintiff, Susan Holloway never was, proving that Plaintiff could not have falsely confessed to Holloway.

72.     To procure this false testimony, the Police Officer Defendants made improper, undisclosed promises and offered impermissible incentives to Holloway.

**Defendants Conceal Further Exculpatory Evidence**

73.     To perfect their conspiracy, the Police Officer Defendants, with approval of the supervising Defendants, failed to disclose to Plaintiff and his attorneys, and state prosecutors, evidence that tended to support Plaintiff's innocence.

74.     The Police Officer Defendants, for example, deliberately destroyed important evidence central to the crime at issue, including but not limited to the notes Defendants Tessmann and Meadie took during Plaintiff's 17-hour interrogation—the only real evidence of what Plaintiff may have said to Defendants.

75.     Defendants also suppressed material, exculpatory evidence when they failed to turn over details surrounding Holloway's false testimony, including a fabricated photo-lineup in which Defendant Winston supposedly identified Holloway, the improper promises that they had made and their course of misconduct in securing false statements from her (and documents and other artifacts related to those promises), and the jail lockup logbook proving Plaintiff had never been in lockup with Holloway in the first place.

76.     Finally, after Plaintiff was coerced into signing two statements implicating himself in his grandmother's murder, the Police Officer Defendants produced a series of false and fraudulent police reports and related memoranda, which they inserted into their case file. These documents, which were evidence used to show Plaintiff's purported connection to the crime,

contained statements and described events that were fabricated and that the Police Officer Defendants knew to be false. The Police Officer Defendants signed these reports, both as investigators and as supervisors, despite their knowledge that the information contained in those reports was entirely false.

77.     The Police Officer Defendants concealed the misconduct described above from Plaintiff and his criminal defense attorneys. Indeed, the Police Officer Defendants continue to this day to conceal evidence in their possession demonstrating Plaintiff's innocence; and they continue to hide their own fabrication of evidence and their improper manipulation of witnesses.

78.     On information and belief, the Police Officer Defendants suppressed additional information and evidence yet unknown to Plaintiff.

79.     Supervisors of the Police Officer Defendants, including Stevenson and Haley, knew that those Defendants had fabricated evidence against Plaintiff and had suppressed evidence tending to reveal the conspiracy, but those supervisors nevertheless intentionally ignored the misconduct and decided to make Plaintiff responsible for a crime he did not commit, rather than directing the officers to go out and find the person who had killed Augustine Melock.

80.     The Police Officer Defendants' misconduct deprived Plaintiff of evidence that would have established further that he had no connection to the murder.

## Plaintiff's Wrongful Conviction and Imprisonment

81.     As a result of Defendants' misconduct, Plaintiff was charged with murder.

82.     Defendants knew there was no probable cause to suspect Plaintiff of the murder of his grandmother. No physical evidence connected him to the crime scene. Indeed, the only evidence tying Plaintiff to the crime—the fabricated statements signed by Plaintiff and the jailhouse snitch's statements—was procured through manipulation and coercion.

83.    As a result of Defendants' misconduct, Plaintiff was tried in the Circuit Court of Lake County in a 1989 jury trial.

84.    The State's case hinged upon the false and fabricated statements signed by Plaintiff and the false and fabricated jailhouse snitch's testimony. No other evidence, physical or otherwise, linked him to the crime.

85.    Without the Defendants' false and fabricated confessions and the jailhouse snitch's testimony, secured by the misconduct described herein, Plaintiff would never have been convicted.

86.    A jury found plaintiff guilty of first-degree murder of his grandmother and he was sentenced to death.

87.    Plaintiff's conviction was reversed and remanded for a new trial on direct appeal.

88.    On retrial, the State's case again hinged on the fabricated confessions and the jailhouse snitch's testimony. A jury found Plaintiff guilty of murder while attempting to commit criminal sexual assault, and the judge sentenced him to a minimum of 85 years in prison.

89.    Plaintiff was just 22 at the time of the crime. The following decades of his life have been deeply affected by the horror of his wrongful conviction.

**Plaintiff's Exoneration**

90.    In the years following his conviction, Plaintiff fought tirelessly to prove his innocence.

91.    He filed a direct appeal of his conviction and 85-year sentence. He later filed motions for post-conviction relief and federal habeas relief. None of his efforts were successful.

92.    In 2023, Plaintiff filed a petition for post-conviction relief based on newly discovered evidence in the form of the jail logbook which proved he had never been in lockup with

the jailhouse snitch, Holloway, along with evidence that Defendant Tessmann had coerced false confessions from several other innocent people over the years.

93.     The Conviction Integrity Unit of the Lake County States Attorney's Office agreed that the petition had merit and stipulated that, based on the newly discovered evidence, Plaintiff's conviction should be vacated.

94.     On December 12, 2023, the court vacated Plaintiff's conviction and, that same day, the State entered a motion of *nolle prosequi* and dismissed all charges against him.

### Plaintiff's Damages

95.     Plaintiff's arrest without cause for a crime he did not commit yanked him suddenly from his life as a young adult and landed him in prison, where he languished for over three decades.

96.     During his 35 years of wrongful imprisonment, Plaintiff was unfairly deprived of the ability to interact with family and friends; be present for birthdays, holidays, deaths, and other life events; pursue his passions and interests; and grow into a free adult who could engage in meaningful labor, develop a career, create a family, and live as an autonomous person.

97.     Instead, Plaintiff was branded a murderer and a rapist and imprisoned in harsh, dangerous, and isolating conditions in Illinois prisons, where he spent his twenties, thirties, forties, and some of his fifties. Each day he was locked in prison he faced physical violence, emotional abuse, and the fear that he might die without ever having the opportunity to clear his name.

98.     Now exonerated, Plaintiff must struggle to build an existence outside of prison without the benefit of years of foundational life experiences that normally equip young adults for such a task. He must also attempt to rebuild the relationships that atrophied during years of neglect.

99.     This time was emotionally, physically, and psychologically dehumanizing and debilitating, and Plaintiff has suffered from fear, anxiety, despair, boredom, and loneliness.

## COUNT I – 42 U.S.C. § 1983
## Fabricated False Confession
## (Fifth and Fourteenth Amendments)

100.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

101.    As described above, Police Officer and John Reid Defendants, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, and others unknown, forced Plaintiff to sign false statements involuntarily and against his will, which incriminated him and which were used against him in criminal proceedings, in violation of his rights secured by the Fifth and Fourteenth Amendments.

102.    In addition, as described above, the Police Officer and John Reid Defendants, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, fabricated a false confession, which was attributed to Plaintiff and used against Plaintiff in his criminal proceedings, in violation of Plaintiff's right to a fair trial protected by the Fourteenth Amendment.

103.    Specifically, Defendants conducted, participated in, advised, encouraged, ordered, and approved the use of illegal and coercive tactics which overbore Plaintiff's will and resulted in him signing involuntary statements implicating himself in crimes he did not commit including murder.

104.    Those false incriminating statements were wholly fabricated by Defendants and attributed to Plaintiff. Those false incriminating statements were used against Plaintiff to his detriment throughout his criminal case. They were the reason that Plaintiff was prosecuted and convicted.

105.    As a direct and proximate result of Defendants' misconduct, Plaintiff sustained and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological

trauma, and emotional suffering, as set forth above.

106.     Defendants' misconduct described in this count was undertaken pursuant to the policies and practices of the City of Waukegan, which are more fully described below.

### COUNT II – 42 U.S.C. § 1983
### Due Process
### (Fourteenth Amendment)

107.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

108.     As described above, Police Officer Defendants, while acting individually, jointly, and in conspiracy with one another, deprived Plaintiff of his constitutional right to due process and his right to a fair trial and his right not to be wrongfully convicted and imprisoned.

109.     As described more fully above, Police Officer Defendants procured fabricated jailhouse snitch testimony stating that Plaintiff confessed to the crime through deception, manipulation, and promises of leniency.

110.     Defendants caused this false testimony to be used during Plaintiff's criminal trials.

111.     The Defendants also concealed exculpatory information, fabricated evidence, and destroyed additional evidence, including but not limited to the circumstances surrounding the manipulated jailhouse snitch testimony, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

112.     In addition, based on information and belief, the Defendants concealed, fabricated, and destroyed additional evidence that is not yet known to Plaintiff.

113.     Defendants obtained Plaintiff's conviction based only on this false evidence, and they failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff during his criminal case.

114.    The Defendants misconduct directly resulted in Plaintiff's unjust and wrongful criminal prosecution, his conviction, and the deprivation of his liberty, thereby violating his right to due process and a fair trial guaranteed by the Fourteenth Amendment of the United States Constitution. Absent this misconduct, Plaintiff's prosecution would not and could not have been pursued, and Plaintiff would not have been convicted.

115.    As a direct and proximate result of Defendants' misconduct described in this count, Plaintiff lost his liberty and sustained and continues to sustain injuries, including physical injury, emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous and continuing injuries and damages as set forth above.

116.    Defendants' misconduct described in this count was undertaken pursuant to the policies and practices of the City of Waukegan, which are more fully described below.

### COUNT III – 42 U.S.C. § 1983
### Malicious Prosecution and Unlawful Detention
### (Fourth and Fourteenth Amendments)

117.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

118.    In the manner described above, Police Officer Defendants, individually, jointly, and in conspiracy with one another, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

119.    In so doing, these Defendants maliciously prosecuted Plaintiff and caused Plaintiff to be deprived of his liberty without probable cause and to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

18

120.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

121.     As a direct and proximate result of Defendants' misconduct described in this count, Plaintiff lost his liberty and sustained and continues to sustain injuries, including physical injury, emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous and continuing injuries and damages as set forth above.

122.     Defendants' misconduct described in this count was undertaken pursuant to the policies and practices of the City of Waukegan, which are more fully described below.

<div align="center">

**COUNT IV – 42 U.S.C. § 1983**
**Failure to Intervene**

</div>

123.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

124.     In the manner described above, during the constitutional violations described herein, all individual Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the duty and the opportunity to do so.

125.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

126.     As a direct and proximate result of Defendants' misconduct described in this count, Plaintiff lost his liberty and sustained and continues to sustain injuries, including physical injury, emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous and continuing injuries and damages as set forth above.

127.     Defendants' misconduct described in this count was undertaken pursuant to the policies and practices of the City of Waukegan, which are more fully described below.

## COUNT V – 42 U.S.C. § 1983
## Conspiracy to Violate Constitutional Rights

128.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

129.    In the manner described more fully above, the Police Officer and John Reid Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to fabricate evidence and to detain, prosecute, and convict Plaintiff for the murder of Augustine Melock, regardless of Plaintiff's guilt or innocence, and thereby to deprive him of his constitutional rights.

130.    In so doing, these co-conspirators agreed to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

131.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

132.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

133.    As a direct and proximate result of Defendants' misconduct described in this count, Plaintiff lost his liberty and sustained and continues to sustain injuries, including physical injury, emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous and continuing injuries and damages as set forth above.

134.    Defendants' misconduct described in this count was undertaken pursuant to the policies and practices of the City of Waukegan, which are more fully described below.

## COUNT VI – 42 U.S.C. § 1983
## Policy & Custom Claims

135.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

136.    The constitutional violations that caused Plaintiff's wrongful conviction and the claims set forth in this Complaint were the result of the City of Waukegan's policies, customs, and practices of pursuing convictions without regard to the truth, through reliance on profoundly flawed investigations that involve withholding exculpatory evidence, suppressing evidence, and fabricating evidence to secure a conviction.

137.    At all times relevant to the events described in this complaint and for a period of time before and after, the City of Waukegan failed to promulgate proper or adequate rules, regulations, policies, and procedures governing: The conduct of interrogations and questioning of criminal suspects and witnesses; the collection, documentation, preservation, testing, and disclosure of evidence, including physical evidence, material exculpatory evidence and impeachment evidence, and information bearing upon the credibility of both lay and law-enforcement witnesses; the writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses and suspects; intervention to prevent and redress misconduct by other officers; and the maintenance of investigative files and disclosure of those files in criminal proceedings.

138.    Also or alternatively, the City of Waukegan failed to promulgate proper and adequate rules, regulations, policies, procedural safeguards, and procedures for the training and supervision of their police officers, with respect to the conduct of interrogations and techniques to be used when questioning criminal suspects and witnesses; the production and disclosure of evidence, including physical evidence, material exculpatory evidence and impeachment evidence, and information bearing upon the credibility of both lay and law-enforcement witnesses; the

writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; intervention to prevent and redress misconduct by other officers; and the maintenance of investigative files and disclosure of the files in criminal proceedings.

139. In addition, at all times relevant to the events described in this complaint and for a period of time before, the City of Waukegan had notice of practices and customs of officers and agents of the WPD that included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, and/or did not disclose investigative or other materials to prosecutors and criminal defendants; (2) officers falsified jailhouse snitch testimony through manipulation and promises of leniency; (3) officers failed to maintain and/or preserve material evidence and/or destroyed evidence; (4) officers coerced suspects into adopting fabricated confessions through psychological abuse and manipulation; (5) officers purposefully failed to document what occurred during interrogations in order to facilitate and conceal their wrongdoing; (6) officers pursued wrongful convictions through profoundly flawed investigations; (7) officers deliberately covered up their own past wrongful and illegal misconduct and assisted one another in doing so; and/or (8) officers shirked their sworn duty to conduct honest investigations in order to cover up misconduct by fellow officers.

140. These policies, practices, and customs have resulted in numerous well-publicized false convictions cases investigated by the Waukegan Police Department, both before and after Plaintiff's wrongful conviction. These include, but are not limited to, the following:

      a. Bennie Starks: In 1986 Waukegan police detectives committed numerous wrongful acts, including fabricating false reports and evidence, which resulted in a wrongful conviction and 20 years of wrongful imprisonment. Mr. Starks was freed in 2006 after DNA evidence proved he had not committed the rape

for which he was convicted.

b.  Alejandro Dominguez: In 1990 Mr. Dominguez, then 16, was convicted of a 1989 rape. Waukegan police officers committed numerous wrongful acts in building the case against him, including manipulating witnesses, coercing a fabricated confession, and suppressing exculpatory evidence. Mr. Dominguez's conviction was overturned in 2002, when DNA evidence showed he did not commit the rape.

c.  Juan Rivera: In 1992, Waukegan police officers, including Defendants Lucian Tessmann and Donald Meadie, operating through the Lake County Major Crimes Task Force, committed numerous wrongful acts, including coercing confessions, manufacturing evidence, and suppressing exculpatory evidence. This resulted in 20 years imprisonment for a rape and murder that Mr. Rivera did not commit. Mr. Rivera was exonerated when it was shown that his confession was coerced, no physical evidence linked him to the crime, and he was excluded by DNA.

d.  Herman Williams: In 1994, Waukegan police officers, including Defendant Lucian Tessmann, operating through the Lake County Major Crimes Task Force, committed numerous wrongful acts, including fabricating a false confession, which resulted in a wrongful conviction and three decades of imprisonment for the murder of his ex-wife. No physical evidence implicated Mr. Williams in the crime, and he was eventually exonerated after DNA evidence excluded him as the perpetrator.

e. Angel Gonzalez: In 1994, Waukegan police officers first had a rape victim "identify" Gonzalez in a highly suggestive manner, and then, after lengthy questioning, forced Gonzalez, who spoke little English, to sign an English language "confession" that he could not read and that contradicted the Spanish-language account he had given to the police earlier. Gonzalez was cleared 20 years later after DNA proved he had not committed the rape.

f. James Edwards: In 1996, Waukegan police officers committed numerous wrongful acts, including coercing a false confession by feeding false information, which resulted in a wrongful conviction and 15 years of imprisonment for the murder of a local store owner. No physical evidence implicated Mr. Edwards in the crime, and he was eventually cleared after DNA collected at the scene was matched to a man who had been arrested for a series of armed robberies in the area. Prosecutors conceded that his "confession" was both coerced and false.

g. Jason Strong: In 2000, after the body of an unidentified woman was found beaten to death in a forest preserve, Waukegan police officers, including Defendants Lucian Tessmann and Donald Meadie, operating through the Lake County Major Crimes Task Force, committed numerous wrongful acts, including coercing false confessions from Mr. Strong and his two co-defendants, manufacturing evidence, and suppressing exculpatory evidence. This resulted in 15 years' imprisonment for a murder that Mr. Strong did not commit. Mr. Strong was exonerated when newly discovered evidence proved

that his confession, along with the confessions of his two co-defendants, were demonstrably false.

h. Colleen Blue: In 2001, after the body of a newborn baby was found in a trash container, Waukegan police officers working through the Lake County Major Crimes Task Force officers, including Defendant Lucian Tessmann, used coercion to obtain a vivid, fabricated confession from Ms. Blue, in which she "confessed" that she delivered the baby while she was alone, had placed it in the container, and could hear the baby crying as she walked away until passing cars drowned out the sound. Charges were dropped after DNA testing determined that the baby was not hers—she had never been pregnant and never had the baby.

i. Jerry Hobbs: In 2005, Waukegan police officers, operating through the Lake County Major Crimes Task Force, committed numerous wrongful acts, including an uninterrupted, 20-hour interrogation in which Mr. Hobbs was coerced into confessing to a double rape and murder of his daughter and her friend. After being wrongly imprisoned for 5 years, Mr. Hobbs was exonerated after DNA linked to a convicted rapist proved that Mr. Hobbs was innocent.

141.    These widespread policies, practices, and customs, individually and/or together, were allowed to flourish—and become so well settled as to constitute *de facto* policy of the City of Waukegan—because the leaders, supervisors, and policymakers of the City directly encouraged them and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees; by failing to adequately punish and discipline instances of similar misconduct; and by maintaining a code of

silence pursuant to which officers were encouraged not to rat one another out, thus directly encouraging future abuses like those affecting Plaintiff.

142.    Defendant City of Waukegan was aware of the need for adequate policies, training, and supervision, was deliberately indifferent to the need, and made a deliberate choice not to adopt adequate policies, training, or supervision; this choice was an official policy.

143.    As a direct and proximate result of Defendants' misconduct while they were acting pursuant to one or more of the policies, practices, and customs set forth above, Plaintiff sustained and continues to suffer grievous injuries, including loss of liberty, physical injury, psychological trauma, and emotional suffering, as set forth above.

### COUNT VII – State Law Claim
### Malicious Prosecution

144.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

145.    In the manner described above, the Police Officer Defendants, individually, jointly, and in conspiracy with one another, accused Plaintiff of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

146.    In so doing, the Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

147.    The judicial proceedings were terminated in Plaintiff's favor and in a manner indicative of his innocence when his conviction was vacated and charges against him were dropped in December 2023.

148.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

149.     As a direct and proximate result of Defendants' misconduct described in this count, Plaintiff lost his liberty and sustained and continues to sustain injuries, including physical injury, emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous and continuing injuries and damages as set forth above.

### COUNT VIII – State Law Claim
### Intentional Infliction of Emotional Distress

150.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

151.     The actions, omissions, and conduct of the Police Officer and John Reid Defendants as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

152.     Defendants acted in a despicable manner subjecting Plaintiff to cruel and unjust hardship in conscious disregard of his rights; committed intentional misrepresentation and deceit; concealed material facts known to them to deprive Plaintiff of his legal rights; intended to cause injury to Plaintiff; and willfully and consciously disregarded Plaintiff's rights and safety.

153.     As a direct and proximate result of Defendants' misconduct described in this count, Plaintiff lost his liberty and sustained and continues to sustain injuries, including physical injury, emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous and continuing injuries and damages as set forth above.

## COUNT IX – State Law Claim
## Willful and Wanton Conduct

154.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

155.    At all times relevant to this complaint the Defendants had a duty to refrain from willful and wanton conduct in connection with the Augustine Melock murder investigation.

156.    Notwithstanding that duty, the Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights.

157.    As a direct and proximate result of Defendants' misconduct described in this count, Plaintiff lost his liberty and sustained and continues to sustain injuries, including physical injury, emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous and continuing injuries and damages as set forth above.

## COUNT X – State Law Claim
## Civil Conspiracy

158.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

159.    As described more fully in the preceding paragraphs, the Police Officer and John Reid Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

160.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

161. The violations of Illinois law described in this complaint, including Defendants' malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were accomplished by Defendants' conspiracy.

162. The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

163. As a direct and proximate result of Defendants' misconduct described in this count, Plaintiff lost his liberty and sustained and continues to sustain injuries, including physical injury, emotional pain and suffering, great mental anguish, humiliation, degradation, and other grievous and continuing injuries and damages as set forth above.

## COUNT XI – State Law Claim
### *Respondeat Superior*

164. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

165. At certain times material to this complaint, the Defendants were employees, members, and agents of the City of Waukegan and John Reid & Associates, acting within the scope of their employment.

166. Defendant City of Waukegan is liable as principal for all torts committed by its agents. Defendant John Reid & Associates is liable as principal for all torts committed by its agents.

## COUNT XII – State Law Claim
### Indemnification

167. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

168. Illinois law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

169.    At certain times material to this complaint, the Defendants were employees, members, and agents of the City of Waukegan, acting within the scope of their employment in committing the misconduct described herein.

170.    Defendant City of Waukegan is responsible to pay Plaintiff any judgment entered against the Defendants.


WHEREFORE, Plaintiff ROBERT MELOCK respectfully requests that this Court enter a judgment in his favor and against Defendants CITY OF WAUKEGAN, LUCIAN TESSMANN, DONALD MEADIE, DAVID YARC, MICHAEL TAYLOR, ROBERT WINSTON, KEVIN RUNYARD, RICHARD DAVIS, PHILIP STEVENSON, PATRICK HALEY, JOHN REID & ASSOCIATES, INC., MICHAEL MASOKAS, and MARK REID, awarding compensatory damages, attorneys' fees, and costs against each Defendant, punitive damages against each of the Individual Defendants, pre- and post-judgment interest, equitable and injunctive relief against the CITY OF WAUKEGAN, and any other relief that this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, ROBERT MELOCK, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.


Dated: December 10, 2024

<div style="margin-left:40%">

Respectfully submitted,

ROBERT MELOCK

By: */s/ Roz Dillon*_____
Attorneys for Plaintiff

</div>

Jon Loevy
Steve Art
Roz Dillon
Wally Hilke
Fatima Ladha
LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607
(312) 243-5900